**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Tina M. Sharkey, ) | |
| ) | Case No. 3:08CV00140 |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| Commissioner of Social Security, ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| Defendant. ) | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. Pending are Plaintiff's Brief (Docket No. 19) and Defendant's Brief (Docket No. 24). For the reasons set forth below, the Commissioner's decision is affirmed and the case is dismissed.

**PROCEDURAL BACKGROUND**

Plaintiff filed an application for DIB on November 14, 2003, alleging disability since January 24, 2003 (Tr. 74-76). Plaintiff's application was denied initially and upon reconsideration (Tr. 53-56, 57-60, 49-51). On August 30, 2006, a hearing was held on this matter before Administrative Law Judge (ALJ) Mark Carissimi. Plaintiff, represented by counsel, Medical Expert (ME) Dr. Richard Watts and Vocational Expert (VE) Mark Anderson appeared and testified (Tr. 657). The ALJ issued a partially unfavorable decision on September 25, 2006 (Tr. 18-28). The Appeals Council affirmed the ALJ's decision thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 6-8).

**FACTUAL BACKGROUND**

**1.      Plaintiff's Testimony**

At the time of hearing, Plaintiff was 46 years of age, she weighed 242 pounds and was 5'2 ½ inches tall (Tr. 660, 678). Plaintiff had been awarded a general equivalency degree (Tr. 697). Plaintiff resided with her ex-husband in an extended-stay motel (Tr. 678)

Plaintiff's work history included one and one half years as a medical van driver. In this capacity, Plaintiff transported senior citizens to and from dialysis and doctors' appointments. She assisted the seniors in walking up and down steps and maintaining balance. Subsequently, Plaintiff was employed as a cook and dishwasher for the Air National Guard one weekend monthly (Tr. 672. 673, 674, 676). From May 2001 to September 2002, Plaintiff was also employed cleaning boats, condominiums and newly constructed homes (Tr. 674, 678). In this capacity, she engaged in heavy lifting and carrying items weighing up to fifty pounds (Tr. 676).

Plaintiff first noticed problems with back pain in 1998. She experienced pain radiating from her back to her legs, numbness and a burning sensation (Tr. 663). Initial treatment for back pain involved injections and pain medication; however, the relief from pain was temporary (Tr. 664). Plaintiff claimed that the numbness and/or pain in her legs have been attributed to nerve damage (Tr. 665). The pain and/or numbness in her legs progressed to a level of severity preventing her from driving, washing dishes, vacuuming, making the bed or generally doing anything (Tr. 664). After her husband washed, Plaintiff folded the laundry while seated (Tr. 680).

In March 2003, Plaintiff experienced a migraine headache which incapacitated her for several days (Tr. 668). Signs and/or symptoms associated with the headache included vomiting and sensitivity to light and sound (Tr. 669). The medication designed for the treatment of migraine headaches was

subsequently prescribed. Plaintiff noticed a decrease in the frequency of headaches while on this medication. Also during this time, Plaintiff had a small transient ischemic attack or mini stroke (Tr. 668).

Plaintiff had also been diagnosed with anxiety attacks characterized by angina and a burning sensation. She experienced these attacks quite often when she was "around people." Plaintiff only left her home to attend appointments with her physicians (Tr. 670).

Plaintiff had undergone physical and aquatic therapies but without successful results. She abandoned injections for pain because they provided no relief (Tr. 665). She continued to consume a muscle relaxant and analgesic medication. The side effects included lethargy and sleepiness (Tr. 666). Plaintiff was also being treated by a psychiatrist (Tr. 667). The treatment for depression caused insomnia; consequently, she was prescribed a sleep aid (Tr. 666, 667).

2. **ME's Testimony**

The ME was board-certified in internal medicine and cardiology. He characterized Plaintiff's impairments as musculoskeletal, pulmonary and psychological (Tr. 681). The ME reviewed Plaintiff's medical records and made the following observations. First, Plaintiff had not encountered any neurological compromise resulting from the finding of abnormal cells in the internal carotids. Second, the magnetic resonance imaging (MRI) of Plaintiff's spine taken on June 28, 2003 was unremarkable. Third, the sample of spinal fluid tested negative for abnormality. Fourth, Plaintiff was diagnosed with neuralgia in her right thigh. Fifth, the X-ray of her lumbar spine taken on January 24, 2004 was unremarkable. Sixth Plaintiff's neuromuscular examination administered on August 9, 2004 was negative for abnormality. Seventh, the MRI of Plaintiff's lumbar spine administered on October 8, 2004 was basically unremarkable. Eighth, Plaintiff did not have a nerve root problem and there was no

objective support for a finding of fibromyalgia. Ninth, the diagnosis of fibro muscular dysplasia was potentially severe. Tenth, Plaintiff's foot impairment does not obstruct her ability to walk (Tr. 682, 683, 684, 696, 697, 698, 699).

The ME further noted that Plaintiff had been treated for an asthma attack and she had undergone podiatry surgery, the results of which were complicated by pulmonary disease (Tr. 685-686). To control the symptoms of pulmonary disease, Plaintiff was treated with an incentive spirometry, steroids and a bronchodilator (Tr. 686). During the past several years, Plaintiff had only three asthma episodes (Tr. 687).

The ME found that Plaintiff's was diagnosed with depressive and antisocial personality disorders. The examining physician opined that Plaintiff was moderately limited in social interactions but she could maintain attention, concentration, persistence and could perform simple jobs but she would have mild limitations in terms of stress. In the psychiatric review, a psychiatrist diagnosed Plaintiff with recurrent major depression and a panic disorder (Tr. 686).

Considering all of Plaintiff's impairments, the ME did not find, based on the record, that Plaintiff's impairments met or equaled any of the listed impairments. Prior to January 2006, Plaintiff was capable of performing sedentary work (Tr. 695). After May 14, 2006, Plaintiff could perform less than sedentary work (Tr. 688).

Upon examination by Plaintiff's counsel, the ME opined that migraine headaches should not prohibit Plaintiff from working (Tr. 690-691). He further explained that he did not observe any evidence that Plaintiff's condition was worse at the time of hearing (Tr. 691). He suggested that Plaintiff's condition varied from one time to another (Tr. 692).

**3.     VE's Testimony**

The VE testified that a van driver, described in the Dictionary of Occupation Titles (DOT) under 913.663-018, was medium, semi-skilled work, requiring specific vocational preparation of more than one month up to and including three months.  As a result of such employment, Plaintiff had developed no transferrable skills.

Plaintiff's job as cleaner, described in DOT at 323.687-014, was considered light, unskilled work.  However, as Plaintiff performed this work, the job as cleaner may have ranged up to a level of medium, unskilled labor.

The hypothetical person of Plaintiff's age at the date of onset, educational, exertional and vocational backgrounds, limited to sedentary work with environmental restrictions, could not perform any of Plaintiff's past relevant work (Tr. 701-702).  There were, however, unskilled sedentary jobs that would meet the criteria of the hypothetical.  For instance, there would be an electrical appliance component assembler.  This job is found at DOT number 723.687-010.  It is considered sedentary, unskilled work and there are 150,000 in the nation, 10,000 in the state and 2,500 in the Northeast Ohio economy.

In addition the hypothetical plaintiff could perform work as a bench assembler as described in DOT number 700.687-062.  Such work is considered sedentary and unskilled labor.  In the nation there are 75,000 jobs, in the state there are 3,000 jobs and in the Northeast Ohio economy, there are 250 jobs (Tr. 702).

Finally, the hypothetical plaintiff could perform work as a document scanner/microfilm preparer. This job is described in DOT 249.587-018 as sedentary and unskilled work.  There are 170,000 such jobs in the nation, 25,000 in the state and 4,000 in the Northeast Ohio economy (Tr. 703).

Upon examination by Plaintiff's counsel, the VE explained that the standard for absenteeism and tardiness in the work environment is generally an employability issue. One day per week would not be acceptable and would not be consistent with competitive employment. The standard break of seven to ten minutes off task for any reason is considered productive (Tr. 704). Exceeding more than ten minutes in any hour is unacceptable (Tr. 705).

## **MEDICAL EVIDENCE**

The results of chest X-rays administered on January 20, 2001 were normal (Tr. 234). Plaintiff was diagnosed with pleurisy on January 30, 2001 (Tr. 233).

On February 4, 2001, Dr. Mark Smith determined that Plaintiff's labored breathing was not the result of pneumonia or a collapsed lung (Tr. 225). Plaintiff was treated for symptoms associated with chronic obstructive pulmonary disease (COPD) exacerbated by tobacco dependency and exogenous obesity with suspected gastroesophageal reflux disease (Tr. 228, 230). No active cardiopulmonary disease was evident (Tr. 231).

Plaintiff was diagnosed with a left fifth digit contusion on May 11, 2001 (Tr. 222). She sprained her left ankle and on May 23, 2001, was prescribed medication for pain. The X-ray of Plaintiff's left ankle was negative for fracture (Tr. 218).

Dr. Richard Kendall diagnosed Plaintiff with the inflammation of the lymph node and bronchitis on January 19, 2002 (Tr. 215).

From February 11, 2002 through June 2004, Dr. Anthony Thompson treated Plaintiff for several health issues including a bee sting, hypertension, depression, gastritis, exposure to streptococcal bacteria, anxiety, possible transient ischemic attacks, intermittent lumbar pain, an upper urinary tract

6

infection, lumbar pain, inflammation of the nasal passages, bronchitis, muscle tension, and gastroenteritis (Tr. 309-357, 361-388, 391-395, 450).

Plaintiff was diagnosed and treated for a migraine headache on February 15 and February 17, 2002 (Tr. 209, 211). She was treated for rash, itching and swelling of the tongue on October 12, 2002 (Tr. 207). On January 3, 2003, Plaintiff underwent an exploratory laparotomy to remove a cyst (Tr. 191-192, 197-198). Plaintiff was prescribed a steroid, a narcotic pain reliever and an allergy medication to treat low back pain (Tr. 199).

On March 9, 2003, Plaintiff presented twice to Bellevue Hospital with an acute migraine headache. Initially she was given a shot of Demerol. Later she was prescribed a combination of drugs, including a pain reliever, an antibiotic and antihistamine to relieve the pain and prevent bacterial infection (Tr. 167-169, 171-172, 205-206, 495-498).

The results from the computed tomographic (CT) scan of Plaintiff's brain taken on March 10, 2003, were normal (Tr. 474). Plaintiff underwent an MRI of the brain on March 10, 2003, the results of which were unremarkable (Tr. 170).

On March 26, 2003, Dr. Alex Abou-Chebl found no evidence of an aneurysm (Tr. 173). On March 28, 2003, an examining physician at Advanced Neurological Associates (ANA) started Plaintiff on a regime of aspirin and seizure medication (Tr. 437). Through the course of treatment, Plaintiff was treated for low back pain with paraspinal muscle injections and oral medications were prescribed to treat symptoms of episodic headaches (Tr. 287-307, 427, 430, 432, 435).

The results of the MRI administered on June 26, 2003 showed no disc herniation (Tr. 308).

Plaintiff was hospitalized due to intractable low back pain on November 17, 2003. She was diagnosed with degenerative disc disease and lumbar radiculopathy. Intravenous antibiotics

7

significantly decreased her symptoms by November 26, 2003 (Tr. 236-241, 463-464). During the course of treatment, mild peribronchial thickening was observed; however, there was no evidence of acute cardiac or pulmonary disease (Tr. 282, 283).

Plaintiff was treated for lumbosacral pain and degenerative disc disease of the spine on December 22, 2003 (Tr. 280).

After conducting a clinical interview on January 31, 2004, James N. Spindler, M.S., diagnosed Plaintiff with a depressive disorder, personality disorder with antisocial features, psychological stressors and some mild symptoms or some difficulty in social, occupational, or school functioning (Tr. 251). He opined that Plaintiff's mental ability to relate to others was mildly impaired, her mental ability to understand, remember and follow instructions was not significantly impaired, her mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was not significantly impaired and her ability to withstand the stress and pressure associated with day-to-day work activities was mildly impaired (Tr. 251-252).

Medication for pain was administered when Plaintiff slipped on ice, fracturing her left radius on January 23, 2004 (Tr. 243-244). The X-ray of Plaintiff's lumbar spine was normal, identifying no malalignment (Tr. 245).

On March 9, 2004, Dr. Franklin D. Krause interpreted Plaintiff's pulmonary function test and found that she had minimal restrictive and distinctive defects (Tr. 256).

On March 9, 2004, Dr. William B. Benninger, Ph. D., diagnosed Plaintiff with depressive and antisocial personality disorders (Tr. 263, 267). In his opinion, Plaintiff had a mild degree of limitations in her activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace (Tr. 270).

Dr. Ellin Cusack Frair opined on March 16, 2004, that despite degenerative disc disease, asthma, migraines, hypertension and dysplasia, Plaintiff had the residual functional capacity to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and limit pushing and/or pulling in the upper extremities (Tr. 274). Plaintiff was limited to occasionally balancing, stooping, kneeling, crouching and crawling (Tr. 275). Exposure to fumes, odors, gases and hazards was contraindicated (Tr. 276). Plaintiff had no manipulative, visual or communicative limitations (Tr. 275-276)

In July 2004, Dr. Abou-Chakra prescribed an increased dosage of a muscle relaxant designed to treat chronic lower back pain (Tr. 407, 409, 423).

On August 9, 2004, an examining physician at the ANA determined that Plaintiff suffered from fibromuscular dysplasia and was at risk for recurrent transient ischemic attacks (Tr. 406). Her care was managed with medication and physical therapy (Tr. 412-420, 426).

Dr. Elizabeth Das conducted a residual functional capacity assessment on August 12, 2004, finding that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 400). Plaintiff should never climb using a ladder, rope or scaffold but she could frequently climb using a ramp or stairs and she could occasionally balance, stoop, kneel, crouch, or crawl (Tr. 401). Plaintiff was advised to avoid concentrated exposure to fumes, odors, gases, dusts and hazards (Tr. 402). She had no manipulative, visual or communicative limitations ( 401-402).

After undergoing an evaluation for physical therapy on August 18, 2004, Plaintiff was seen once and she failed to "show" for the other scheduled appointments (Tr. 503, 508). Plaintiff was evaluated

9

again for physical therapy on October 5, 2004 (Tr. 511-513). Plaintiff "showed" once for therapy (Tr. 516).

The radiological procedure administered on October 8, 2004 showed evidence of cysts on the S1 and S2 nerve root sheaths on the right and the S2 nerve root sheaths on the left (Tr. 481). The chest study conducted in November 2004 showed no acute cardiopulmonary process (Tr. 494).

Although incomplete, the treadmill test was negative for significant ischemia on January 21, 2005 (Tr. 479). Dr. Brendan Bauer prescribed pain medication to treat Plaintiff's headaches on January 21 and February 18, 2005 (Tr. 568-569).

In April 2005, Plaintiff commenced a course of pain management. No significant improvement was noted when she completed the therapy on February 9, 2006 (Tr. 571-579). In the interim, Plaintiff was diagnosed with cellulitis on August 21, 2005 (Tr. 620). On November 10, 2005, Plaintiff was diagnosed with gastroenteritis (Tr. 623).

On January 6, 2006, Dr. David West discovered a fracture at the medial base of the fourth phalanx (Tr. 597). Dr. Richard Kendall diagnosed Plaintiff with a contusion of the left foot on January 7, 2006. Plaintiff was placed in a fracture shoe and prescribed a narcotic pain reliever (Tr. 624). Dr. Christopher Pensiero, a Doctor of Podiatric Medicine, treated Plaintiff from January 7 to May 11, 2006 (Tr. 506). He diagnosed her with a neuroma and possible tear or injury to her left foot (Tr. 596). During her last appointment, Dr. Pensiero noted that Plaintiff's pain was less excruciating (Tr. 593).

During the course of treatment with Dr. Pensiero, Plaintiff was treated on an emergency basis for an urinary tract infection on February 1, 2006, and for pneumonia and deprivation of oxygen on February 12, 2006 (Tr. 629, 630-631). On February 12, 2006, Plaintiff was oxygenated and medication was prescribed to facilitate breathing (Tr. 634).

The radiological review of Plaintiff's chest showed interval resolution of Plaintiff's right lower lobe opacity and moderate peribronchial thickening on February 13, 2006 (Tr. 642, 643).

Dr. Daniel Herring ordered tests that measured Plaintiff's breathing , lung volumes, diffusion and airway resistance on February 27, 2006 (Tr. 626, 644).  On May 16, 2006, Dr. Herring completed a medical source statement in which he opined that Plaintiff's abilities to lift/carry, stand/walk and sit were affected by her impairment (Tr. 581).  He suggested that Plaintiff's limitations were the result of fibromyalgia (Tr. 582).

In the interim during March and April 2006, Carolyn Bing-Nieset, M.S.W. and L.S.W., counseled Plaintiff in matters of grief, loss and relationships (Tr. 612-615).  Contemporaneous with counseling, Dr. Kelly L Sprout prescribed Lexapro, a medication designed for the treatment of depression and anxiety (Tr. 607-612).

On August 11, 2006, Dr. Lara Feldman opined that Plaintiff had no useful ability to deal with work stressors, maintain attention for extended periods, relate to co-workers and interact with co-workers in a competitive setting (Tr. 617, 618).

Dr. Emad Elbadawy diagnosed Plaintiff with low back pain with bilateral sciatica, diabetes, fibromyalgia, depression, hypertension, hyperlipidemia and major depression and anxiety on August 23, 2006 (Tr. 648).  Dr. Elbadawy also found that Plaintiff was able to raise her shoulders, elbows, wrists, fingers, hips, knees and feet against maximal resistance and that the range of motion for her cervical spine, shoulders, elbows, writs and hands/fingers was within the normal range (Tr. 650, 651). The range of motion in Plaintiff's dorsolumbar spine, hips, knees and knees was limited (Tr. 651-652).

Dr. Elbadawy suggested that Plaintiff was limited to occasionally lifting and/or carrying ten pounds, frequently lifting and/or carrying less than ten pounds, standing and/or walking less than two

11

hours in an eight-hour workday and limited in the ability to push and pull using the lower extremities (Tr. 655-656). It was recommended that Plaintiff limit her exposure to temperature extremes, dust, humidity, fumes and odors (Tr. 656). There were no manipulative or visual/communicative limitations (Tr. 655).

## **STANDARD FOR DISABILITY**

To establish entitlement to disability benefits, a claimant must prove that he or she is incapable of doing substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a period of twelve months or results in death. *Murphy v. Secretary of Health and Human Services*, 801 F. 2d 182, 185 (6th Cir. 1986) (*citing* 42 U. S. C. § 423(d)(1)(A) (1986)). The claimant must show that his or her impairment results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques derived from acceptable medical sources. 20 C.F.R. §§ 404.1513, 404.1528 (Thomson Reuters/West 2008).

To determine disability, the ALJ uses a five-step sequential evaluation process. During the first four steps, the claimant has the burden of proof. *Walters v. Commissioner of Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and*

*Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)). This burden shifts to the Commissioner only at Step Five. *Id.*

The ALJ considers (1) whether claimant is working; (2) whether claimant has a severe impairment; (3) whether claimant's impairment(s) meets or equals a listed impairment in Appendix1 of Subpart P of Part 404, Listing of Impairments; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. 20 C.F.R. § 1520(a)-(f) (Thomson Reuters/West 2008).

If the claimant is working or has no impairment or combination of impairments which significantly limit physical or mental abilities, a finding that the claimant is not disabled will ensue despite medical condition, age, education, and work experience. However, when an impairment meets the durational requirement and meets or equals a listed impairment in Appendix 1, a determination of disabled will issue without consideration of age, education or work experience. If a decision cannot be made based on current work activity or on medical facts alone, and a severe impairment(s) exists, the ALJ must review the claimant's residual functional capacity (RFC) and the physical and mental demands of past relevant work. If the claimant can still do this kind of work, the ALJ will find the claimant not disabled. If the claimant cannot do any past relevant work because of the impairment, further consideration of the claimant's RFC, age, education and past work experience is explored to determine if the claimant can do other work. If the claimant cannot do other work, the ALJ must find the claimant disabled.

## ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Act through June 30, 2006.

2. Plaintiff had not engaged in substantial gainful activity since August 31, 2002, the alleged onset date.

3. Since the alleged onset date, Plaintiff had the following severe impairments: asthma, degenerative disc disease of the lumbar spine, obesity and depressive disorder.

4. Since the alleged onset date of disability, Plaintiff did not have an impairments or combination of impairments that met or was the medical equivalence of a listed impairment in 20 C. F. R. Part 404, Subpart P, Appendix 1 (Tr. 20).

5. Prior to February 6, 2006, Plaintiff had the residual functional capacity to perform a significant range of sedentary work. Specifically, Plaintiff could lift, carry, push and pull ten pounds occasionally, sit for six hours and stand and/or walk for two hours in an eight-hour workday with normal breaks, avoid high concentrations of dust, fumes and gases, and restrict her work to simple repetitive tasks requiring only superficial interaction with the public and co-workers (Tr. 22)

6. Beginning on February 6, 2006, Plaintiff had the residual functional capacity to perform less than the full range of sedentary work. Specifically, Plaintiff could lift, carry, push and pull five pounds occasionally, sit for three hours and stand and/or walk for two hours in an eight-hour workday with normal breaks, avoid high concentrations of dust, fumes and gases, and restrict her work to simple repetitive tasks requiring only superficial interaction with the public and co-workers. Due to the limitations with sitting and standing caused by the claimant's medically determinable severe impairments, Plaintiff was unable to work on a sustained full-time basis in a competitive work environment (Tr. 25).

7. Since the alleged onset date of disability, Plaintiff has been unable to perform past relevant work.

8. Plaintiff was 42 years of age on the alleged onset date, had a high school education and the ability to communicate in English.

9. Prior to February 6, 2006, transferability of job skills was not material to the determination of disability because using the Medical Vocational Rules as a framework supports a finding that Plaintiff is not disabled even if she had transferrable job skills.

10. Beginning February 6, 2006, Plaintiff was not able to transfer any job skills or other occupations (Tr. 26).

11. Prior to February 6, 2006, there were a significant number of jobs in the national economy that Plaintiff could perform. Beginning on February 6, 2006, there are not a significant number of jobs in the national economy that Plaintiff could perform (Tr. 27).

12. Plaintiff was not disabled prior to February 6, 2006 but became disabled on that date and has continued to be disabled through the date of the decision or September 25, 2006 (Tr. 28).

**STANDARD OF REVIEW**

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales,* 91 S.Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. (*citing Kirk v. Secretary of Health and Human Services*, 667 F. 2d 524, 535, (6th Cir. 1981) *cert. denied*, 103 S.Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id*. (*citing Kirk,* 667 F. 2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently. *See Kinsella v. Schweiker*, 708 F. 2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F. 2d 535, 545 (6th Cir. 1986) (en banc).

**DISCUSSION**

Plaintiff seeks reversal and/or remand of the Commissioner's final decision claiming that (1) the ALJ's finding regarding Plaintiff's residual functional capacity prior to February 6, 2006 is in error and

the hearing decision denying her benefits prior to this date should be reversed; and (2) the ALJ failed to properly evaluate Plaintiff's pain and the impact on her functioning.

**1.      The ALJ Erred in Establishing the Onset Date of Disability.**

Plaintiff challenges the Commissioner as to the onset date of disability.  Specifically, the date of February 6, 2006, was arbitrarily chosen and is not based on substantial evidence.  Plaintiff claims that she maintained the same impairments of the same severity--pain syndrome, obesity, macromastia, lumbago, osteopenia, depression, hypertension, ulcers, stoke, narcotic dependence and fibromyalgia–prior to February 6, 2006.  The case should therefore be reversed and benefits awarded to the actual onset date of disability or January 24, 2003.

SOCIAL SECURITY RULING 83-20, TITLES II AND XVI: ONSET OF DISABILITY (1993) governs the determination of a disability onset date.  *McClanahan, supra,* 474 F.3d at 833.  Once a finding of disability is made, the ALJ must determine the onset date of the disability.  *Id.* (*citing Key v. Callahan,* 109 F.3d 270, 274 (6th Cir. 1997)).  The ruling states, in relevant part:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence.  These factors are often evaluated together to arrive at the onset date.  However, the individual's allegation or the date of work stoppage is significant in determining onset *only if it is consistent with the severity of the condition(s) shown by the medical evidence.*

*Id.* at 833-834 (*citing* SSR 83-20, 1983 WL 31249 at *1 (emphasis added)).  Further, the ruling states that "the medical evidence serves as the primary element in the onset determination."  *Id.* (*citing* SSR 83-20 at * 2).  The established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.  SSR 83-20 at *3.  If the precise evidence is not available, the judgment must be made on an informed judgment of the facts.  *Id.*  At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.  *Id.*

In disabilities of non-traumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. *Id.* The weight to be given any of the relevant evidence depends on the individual case. *Id.* at *2.

The starting point in determining the date of onset of disability is the individual's statement as to when disability began. *Id.* This is found on the disability application and on the Form SSA-3368-F8/3820-F6 (Disability Report). A change in the alleged onset date may be provided in a Form SSA-5002 (Report of Contact), a letter, another document, or the claimant's testimony at a hearing. *Id.*

In this case, Plaintiff claims on Form SSA-3368 that the disability began on August 31, 2002 (Tr. 78). During a face-to-face interview conducted on November 14, 2003, the alleged onset was updated to January 24, 2003 (Tr. 101). On the application for DIB, Plaintiff alleged that her condition became disabling on January 24, 2003 (Tr. 74).

The fact finder must next consider the day the impairment caused the individual to stop work as it is frequently of great significance in selecting the proper onset date. *Id.* The district office (DO) has the responsibility for documenting the claim (via Form SSA-821-F4 (Work Activity Report-- Employee) or Form SSA-820-F4 (Work Activity Report-- Self-Employed Person)) concerning pertinent work activity by the claimant before or after the alleged onset date (this information may also be needed to determine whether insured status is met or when it is first or last met). *Id.*

In this case, the day that Plaintiff stopped work was August 31, 2002 (Tr. 678). Pertinent work activity was documented in the work history report (Tr. 106-120) and confirmed by Plaintiff's testimony at the hearing (Tr. 672-678).

17

Finally, the medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. *Id.* The medical evidence serves as the primary element in the onset determination. *Id.* Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling. *Id.* When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. *Id.*

The ALJ in this case considered all of the medical evidence from all medical sources. The medical record shows that after Plaintiff stopped working, she underwent several routine examinations and/or treatments with unremarkable results until she commenced treatment with Dr. Herring on February 6, 2006.

Prior to February 6, 2006, the medical records reveal that Plaintiff was treated for exacerbation of asthma, back pain and migraines (Tr. 167-169, 170-172, 236-241, 285, 286, 280, 412-416, 426-437, 463-464, 474, 480, 481, 482, 494-519, 503, 564-569). Dr. Thompson prescribed and monitored the intake of medications based on Plaintiff's complaints (Tr. 309-357, 361-388, 391-395). The results from the pulmonary function test administered on March 9, 2004, showed possible restrictive airways (Tr. 256, 257). There was no evidence of an aneurysm on March 26, 2003 (Tr. 173). The results of the MRI administered in June 2003 on Plaintiff's spine and brain were unremarkable (Tr. 170, 308). In November 2003, there was no evidence of cardiac or pulmonary disease (Tr. 283).

The ALJ's decision to establish an onset date of February 2006 is based on a legitimate medical basis. At the hearing, the ALJ called on the services of a medical advisor to infer an onset date. He highlighted Plaintiff's medical history, showing that prior to February 2006, the medical evidence does not establish that Plaintiff's impairments were of the severity to constitute a disability. The onset date

was inferred from a date when it was most reasonable to conclude from the evidence that Plaintiff's impairments had progressed to sufficient severity to prevent her from engaging in substantial gainful employment for at least twelve months.  This period of disability commenced when Plaintiff was examined and/or treated by Dr. Herring in February 2006.  The Magistrate finds no reason to disturb the ALJ's decision since there is a convincing rationale given for the onset date selected.

**2.      The ALJ Failed to Accurately Assess Plaintiff's Pain.**

Plaintiff contends that pain combined with other impairments noted in the record through February 6, 2006 constitutes a disabling condition.  She seeks remand for consideration of her allegations of pain.

It is well settled that pain alone, if caused by a medical impairment, may be disabling for purposes of establishing eligibility for benefits under the Act.  *Kirk, supra,* 667 F. 2d 5at 538.  Claimants seeking disability benefits based on pain must present objective medical evidence of an underlying medical condition that either confirms the severity of the alleged pain as arising from that condition or confirms that the condition is of such severity that it could reasonably be expected to produce the alleged disabling pain.  *Walters*, *supra*, 127 F. 3d at 531.  The Commissioner can conclude that the claimant's allegations of pain are implausible if the subjective allegation, the ALJ's personal observations and the objective medical evidence are contradictory.  *Tyra v. Secretary of Health and Human Services*, 896 F. 2d 1024, 1030 (6th Cir. 1990).  As a matter of law, the ALJ may consider household and social activities in evaluating the claimant's complaints of disabling pain.  *Bogle v. Sullivan*, 998 F. 2d 342, 348 (6th Cir. 1993).

The Magistrate finds that the ALJ did consider Plaintiff's allegations of pain in combination with her other impairments prior to February 2006.  The ALJ acknowledged that the objective medical

evidence confirmed the severity of the alleged pain arising from her impairments and that Plaintiff's medically determinable impairments could produce the alleged disabling pain. He continued by considering Plaintiff's household activities, impairments and social activities in assessing pain. He considered Plaintiff's statements against the evidence of the intensity and persistence of the alleged disabling pain to her daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken by Plaintiff (Tr. 21, 22, 23, 24). These considerations led the ALJ to conclude that Plaintiff's description of the pain was so extreme as to appear implausible (Tr. 24).

The ALJ considered Plaintiff's allegations of pain in determining whether her medically determinable impairments were of the severity to be disabling. The Magistrate finds that remand is not warranted since the ALJ conducted the proper procedural analysis of Plaintiff's allegations of pain prior to February 2006.

## **CONCLUSION**

For these reasons, the decision of the Commissioner is affirmed and the case is dismissed.

So ordered.

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: March 13, 2009